**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

DARREN S.,

Case No. 1:25-cv-11615

      *Plaintiff,*

Patricia T. Morris
United States Magistrate Judge

*v.*

COMMISSIONER OF SOCIAL
SECURITY,

      *Defendant.*

_____/

**MEMORANDUM OPINION AND ORDER ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 9, 11)**

## I. CONCLUSION

For the reasons set forth below, Plaintiff's motion for summary judgment (ECF No. 9) is **DENIED**, the Commissioner's motion for summary judgment (ECF No. 11) is **GRANTED**, and the decision of the administrative law judge (ALJ) is **AFFIRMED**.

## II. ANALYSIS

### A. Introduction and Procedural History

On March 23, 2020, Plaintiff filed an application for disability insurance benefits and supplemental security income, alleging he became disabled on April 1, 2012. (ECF No. 6-1, PageID.35). The Commissioner initially denied the application

1

on November 20, 2020, and on reconsideration on January 19, 2021. (*Id.*). Plaintiff then requested a hearing before an ALJ, which was held on August 10, 2022. (*Id.*). The ALJ issued a written decision on November 1, 2022, finding Plaintiff was not disabled. (*Id.* at PageID.35–45). Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied the request on October 24, 2023. (*Id.* at PageID.19–21).

Plaintiff appealed the decision to this Court, which remanded for a new hearing upon stipulation of the parties. (*Id.* at PageID.1118). The Appeals Council then remanded to the ALJ because the original decision "did not contain an adequate evaluation of opinion evidence from Marie Putnam, LMSW, and Joanna Ingram, LMSW," as regards to the supportability and consistency factors. (*Id.* at PageID.1125). More specifically, the Appeals Council discussed the ALJ's conclusion that

> there were no examples of paranoia in the treatment records. This evaluation did not address and reconcile evidence that documented the claimant having paranoia, including a hospitalization because he believed he was being poisoned, being observed "guarded" and not liking to appear to have mental health concerns, and his reports being turned down for a job and experiencing "some paranoia about feeling like he did something wrong."

(*Id.* at PageID.1126 (internal record citations omitted)). The ALJ thereafter conducted a new hearing (*Id.* at PageID.1064–93) and issued another unfavorable decision (*Id.* at PageID.1045–55).

2

Plaintiff again sought judicial review on May 30, 2025.  (ECF No. 1).  The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters."  (ECF No. 8). The parties have since filed cross-motions for summary judgment for which briefing is complete.  (ECF Nos. 9, 11, 12).

### B.       Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g).  The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."  *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation modified).  "[T]he threshold for such evidentiary sufficiency is not high."  *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir.

3

1989).  Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility."  *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Id.* (citation modified).

## C.      Framework for Disability Determinations

Disability benefits are available only to those with a "disability."  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any.  If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.

> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.

4

(iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.

(iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.

(v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work. If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled. If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled. (ECF No. 6-1, PageID.1055). At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since April 1, 2012, the alleged onset date. (*Id.* at PageID.1047). At step two, the ALJ found the following severe impairments: mood disorder, major depressive disorder, generalized anxiety disorder, bipolar disorder, obsessive compulsive disorder, schizoaffective disorder, and attention deficit hyperactivity disorder (ADHD). (*Id.* at PageID.1048).

At step three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing. (*Id.* at PageID.1048–50).

Next, the ALJ found Plaintiff had the RFC

to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant [is limited to] simple

> routine repetitive tasks performed in a work environment free of fast paced production requirements, such as assembly line work, involving only simple work-related decisions and routine workplace changes and only occasional interaction with the coworkers, and supervisors. The claimant would be limited to no interaction with the public.

(*Id.* at PageID.1050).

At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.1053). However, at step five, the ALJ found other jobs in the national economy that Plaintiff could perform. (*Id.* at PageID.1054). Specifically, the ALJ found Plaintiff could perform the requirements of a cleaner (2,100,000 jobs in the national economy), a cleaner (from another job code, 955,000), a sorter (420,000), and a packer (400,000). (*Id.*). The ALJ thus concluded Plaintiff was "not disabled." (*Id.* at PageID.1055).

### E.   Administrative Record

Plaintiff argues the ALJ erred again in his analysis of Dr. Putnam's opinion. It is important to note that the ALJ's decision is based on two time periods. The first, for disability insurance benefits, covers the period between the alleged onset of disability and the date last insured: April 1, 2012, through December 31, 2016. The second period, for supplemental security income, covers from the application date of March 23, 2020, forward. While the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's issues on appeal. Finally, although Plaintiff does not challenge the ALJ's conclusions about the period

between 2012 to 2016, the Court still notes some important points from the medical record.

In January 2012, Plaintiff was taken to the hospital after walking outside for 10 hours and winding up in someone's driveway. (ECF No. 6-1, PageID.404). It was noted he had depression and ADHD, but it is unclear what, if any, treatment occurred following this visit. (*Id.*). In March, Plaintiff was involuntarily admitted for inpatient psychiatric care because he was experiencing paranoia concerning his mother. (*Id.* at PageID.413). He was noted to have been off his medications for about a month. (*Id.*). He was put back on medications, which he gradually responded to, becoming more cooperative and denying further mood swings or paranoia. (*Id.*). After two-and-a-half weeks, he was transferred to a step-down program because he was "doing well, free of any acute psychotic symptoms, [and] stable on medications without any side effects." (*Id.*).

During follow-up visits, Plaintiff reported he had been taking long walks at night, up to 20 miles, to try to get off the grid because he was paranoid he would be incarcerated by debt collectors. (*Id.* at PageID.431). Nonetheless, he was noted to be stable after his release from the hospital, he reported no longer feeling like his mother was trying to kill him, appeared polite and cooperative at his appointments, with a euthymic mood, appropriate affect, stable sleep, and without evidence of delusions or hallucinations. (*Id.* at PageID.431–32, 435). He continued to show

insight into his illness and the need for his medication.  (*Id.* at PageID.454).  There are no additional relevant medical records until 2019.

Records documenting medication check-ins throughout 2019 show Plaintiff was "stable," "feels well, no problems," and "overall doing good."  (*Id.* at PageID.517–27).  In December 2019, Plaintiff presented for therapy intake with Dr. Putnam.  (*Id.* at PageID.536).  He presented as anxious for the session, but his eye contact was good and he reported his depression was managed with medications.  (*Id.*).  Plaintiff also reported he had a difficult time interacting with other people. (*Id.*).  At his next appointment, he denied any depression, reported his mood had been stable with medication, discussed the business he was trying to start, and presented in a good mood with fair eye contact.  (*Id.* at PageID.538).  Plaintiff presented similarly the next month but discussed some anxiety with an upcoming presentation.  (*Id.* at PageID.539).  He also reported some mania but could not say when or how often he experienced it.  (*Id.*).

At the next appointment in February 2020, Plaintiff presented in a good mood with good eye contact, but he reported being upset by watching the news, getting hyper focused on events such as the impeachment, and having night terrors with screaming.  (*Id.* at PageID.540).  He also reported recently cutting back on his medication for anxiety.  (*Id.*).  In March and April, Plaintiff reported high anxiety concerning COVID-19 and the state of the world.  (*Id.* at PageID.541–43).  He

reported his medications helped him but that he still struggled to leave his home. (*Id.*).  Later in April, Plaintiff continued to report "his psych medication [is] a life changer for him.  He feels they really do help him." (*Id.* at PageID.543).  In May, Plaintiff reported being more excited about life and getting out of his room more often.  (*Id.* at PageID.544).

There is another gap in his records from May 2020, through July 2021, when he reported doing pretty well to Dr. Putnam but was noted to be guarded with what he talks about in session.  (*Id.* at PageID.549).  Later in July, he discussed applying for some jobs and feeling anxious about getting back into the workforce.[1]  (*Id.* at PageID.551).  In August, Plaintiff reported being very frustrated because he did not get the jobs.  (*Id.* at PageID.555).  He felt paranoid that he did something wrong. (*Id.*).

Later in August 2021, Plaintiff went to the hospital with complaints of "something unwell inside of him and some ringing sensation in the small intestine." (*Id.* at PageID.963).  He was admitted for hyponatremia, which is excess water relative to electrolytes in the blood.  (*Id.*).  He was observed as having normal affect. (*Id.* at PageID.964).  Plaintiff told the hospital psychiatrist he thought someone at his house might have poisoned him.  (*Id.* at PageID.974).  He was described as

---

[1] As the ALJ notes, these records appear to be largely copied and pasted session after session, with only minor additions throughout Plaintiff's course of treatment.

delusional and paranoid with a disordered and disconnected thought process and severe impairments in his abilities to make reasonable decisions, work, regulate emotion, and maintain interpersonal relationships. (*Id.* at PageID.976–77). He was recommended for, and discharged to, an inpatient psychiatric facility. (*Id.* at PageID.1038). While there, the facility changed some of his medications, which improved his insight, but he persisted with some mild paranoia. (*Id.* at PageID.599). Nonetheless, his paranoia was noted to be dramatically improved compared to the start of hospitalization. (*Id.*). Upon discharge, his insight, judgment, and paranoia improved, his mood was fair, his affect was congruent with euthymic mood, and he felt the new medication regimen had been significantly helpful. (*Id.*).

After being released, Dr. Putnam resumed therapy with Plaintiff. In October, Dr. Putnam reported the change in medication was making Plaintiff think more clearly but that he still felt everyone was against him, could not trust anyone, and thought his phone was recording him. (*Id.* at PageID.557). Two weeks later, Plaintiff reported doing pretty well but still feeling paranoia; however, he brought his phone with him this time. (*Id.* at PageID.559). Plaintiff shared that he had decided his paranoia prevented him from being able to work. (*Id.* at PageID.559, 563). In November, Dr. Putnam noted she "agrees with him. Due to his paranoia

11

he is not able to work." (*Id.* at PageID.563).[2]

At a January 2022 visit to the clinic for medication management and efficacy, Plaintiff reported he was doing well on the medication regimen. (*Id.* at PageID.1355). Although he discussed experiencing some hallucinations, he declined any changes in medications as he "fe[lt] stable." (*Id.*). He denied any paranoia and endorsed an improved mood. (*Id.*). The provider observed Plaintiff presented with organized thoughts, euthymic mood, congruent affect and mood, and without any delusional content or elements of risk. (*Id.*).

In a therapy session in January 2023, Dr. Putnam noted Plaintiff rarely leaves his house except to go to appointments. (*Id.* at PageID.1420). Later that month, Plaintiff reported going out to lunch with his mom recently, but he was worried that people were talking about him. (*Id.* at PageID.1417). At the next appointment in February, Plaintiff reported not having left his house since the prior appointment because his paranoia made it hard for him to be in public. (*Id.* at PageID.1414).[3] In

---

[2] Except for very small changes, Dr. Putnam's notes barely change from November 2021 to June 2022, with many of the notes being copied and pasted with no new information about how his therapy session that day actually went. (*See* ECF No. 6-1, PageID.563–591). In June, Putnam added that Plaintiff "does pretty well as long as he stays on his routine. His routine is very important to him." (*Id.* at PageID.591).

[3] Another glaring example of Dr. Putnam's note-taking style is seen from January through April 2023. During this period, Dr. Putnam copied and pasted notes from a February appointment in April discussing "recent" occurrences reported from January and the same note about not coming out of his house since "his therapy appointment *two weeks ago*" with the only new addition being that she had not seen him for more than a month. (*Id.* at PageID.1408–20 (emphasis added)). The same note is repeated in May, including the same

December 2023, Plaintiff appeared with appropriate behavior, euthymic mood, congruent affect, excellent insight and judgment, and unremarkable and appropriate thought process and content. (*Id.* at PageID.1371). Somewhat contradictorily, notes indicate that he presented depressed and anxious; but he denied any current paranoia. (*Id.* at PageID.1372). Two weeks later, he appeared the same and reported that his most recent incident of paranoia occurred when he was getting his car fixed as he thought they might be taking advantage of him, which made him feel like he did not know who he could trust. (*Id.* at PageID.1369–70). Putnam's copy and paste note-taking style continued, but in June 2024 she noted on Plaintiff's reports that he has a difficult time being in public due to his paranoia and had thus concluded working a full time job around other people would be impossible. (*Id.* at PageID.1266). Later in June, Plaintiff reported a recent argument with his brother about who was smarter but reported no current paranoia. (*Id.* at PageID.1272). These same notes continued through October 2024. (*Id.* at PageID.1272–85).

Dr. Putnam completed a medical source statement in July 2022. (*Id.* at PageID.546). She opined Plaintiff had marked impairments in his abilities to:

---

internal inconsistencies and outdated information. (*Id.* at PageID.1405). The same note is repeated at his next appointment two weeks later and throughout November, when Putnam also noted Plaintiff has a difficult time with change. (*Id.* at PageID.1378–1402). The inconsistencies continued with Putnam's copied and pasted November 30, 2023 note, which also noted that all current mental status results were normal, unremarkable, or appropriate, including Plaintiff's mood, affect, thought process and content. (*Id.* at PageID.1373–75).

(1) understand, remember, and carry out simple instructions; make judgments on simple, work-related decisions; (2) understand and remember complex instructions; and (3) make judgments on complex work-related judgments. (*Id.*). She explained Plaintiff is very paranoid, would not be able to work with the public, had recently been admitted to the psych unit of a hospital for over 30 days, is very mentally ill but presents okay at times, is very routine oriented and has a hard time with change, and finds it difficult to talk about his mental health. (*Id.*). Putnam also opined Plaintiff had an extreme limitation in interacting appropriately with the public, coworkers, and supervisors, explaining he is paranoid that people talk about him so he isolates and has to stay on schedule to maintain his mental health. (*Id.* at PageID.547).

### F.   Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

(i)    A licensed or certified psychologist at the independent practice level; or

(ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021). A medical source is

an individual who is licensed as a healthcare worker by a State and

15

working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d). In contrast, a nonmedical source is "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.* § 404.1520c(c).

The first factor is "supportability." For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical

16

finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id*. § 404.1520c(c)(3). This factor includes analysis of:

> (i)   Length of the treatment relationship. The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);
>
> (ii)  Frequency of examinations. The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);
>
> (iii) Purpose of the treatment relationship. The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);
>
> (iv)  Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);
>
> (v)   Examining relationship. A medical source may have a better

17

> understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider

> [t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding."  *Id.* § 404.1520c(c)(5).  Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  *Id.*  Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive."  *Id.*

As to the duty to articulate how persuasive the medical opinions and prior

18

administrative medical findings are considered, the new regulations provide "articulation requirements."  The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record.  Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1).  The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2).  As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision.  [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical

19

opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

(i)      Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)     Statements about whether or not [the claimant has] a severe impairment(s);

(iii)    Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;

(iv)     Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;

(v)      Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;

(vi)     Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;

(vii)    Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and

(viii)   Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

[b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504.   Therefore, the SSA "will not provide any analysis in [its]

21

determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.*  The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f).  Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g).  Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*  Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological

tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.* Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.* The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be

23

accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

(i)   [D]aily activities;

24

(ii)     The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii)    Precipitating and aggravating factors;

(iv)     The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)      Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

(vi)     Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)     The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

25

(3)    Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)    The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or

(5)    The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

## G.    Argument and Analysis

Plaintiff argues the ALJ erred in his analysis of Dr. Putnam's opinion and the record evidence supporting it.  First, Plaintiff argues the ALJ erred by ignoring the Appeals Council's remand order by failing to reconcile Dr. Putnam's opinion with the evidence of paranoia the Council identified as overlooked in the prior ALJ opinion.  (ECF No. 9, PageID.1444).  Plaintiff further argues the ALJ ignored evidence of paranoia in the record and focused solely on Plaintiff's denial of paranoia at some therapy visits.  (*Id.*).  The Court's reading of the ALJ's decision does not support this argument.

In the ALJ's "paragraph B" analysis, he found Plaintiff had moderate limitations in interacting with others; concentrating, persisting or maintaining pace; and adapting or managing himself.  (ECF No. 6-1, PageID.1049).  The ALJ specifically discussed Plaintiff's paranoia and noted record instances where Plaintiff felt he had been poisoned by his mother; ongoing (though unspecified) mild

26

paranoia; that his paranoia would distract him from some assigned tasks; and that his paranoia would make it difficult for him to adapt to changing situations. (*Id.*). In the step three analysis, the ALJ discussed Plaintiff's reports of paranoia; his panic attacks, difficulty interacting with others, and isolation; his 2012 and 2021 hospital stays centering around paranoid delusions; and his paranoia in not getting jobs he applied for. (*Id.* at PageID.1050–52). However, the ALJ balanced these facts with Plaintiff's good response to treatment and medication; with records showing Plaintiff returned to largely normal functioning following his hospitalizations; Plaintiff's repeated reports of how his medication was helping; the apparent copying and pasting of Dr. Putnam's records with little added information relevant to each individual therapy session; Plaintiff's repeated denials of *current* paranoia during therapy sessions; and notes discussing that Plaintiff did pretty well when in a routine. (*Id.*). Ultimately, the ALJ acknowledged Plaintiff "presented with paranoia and . . . required hospitalization" at times during treatment but found that he also repeatedly presented with normal exam findings and often denied current paranoia at therapy. (*Id.* at PageID.1052).

There is no indication the ALJ selectively addressed the evidence. Indeed, the only record evidence Plaintiff cites to that the ALJ did not discuss is evidence from medication check-ins showing he was "stable," "feels well, no problems," and "overall doing good," which supports the ALJ's finding. (*Id.* at PageID.517–27).

*See Andres v. Comm'r of Soc. Sec.*, 733 F. App'x 241, 247–48 (6th Cir. 2018) (affirming where ALJ balanced medical evidence of disability with other record evidence and concluding substantial evidence supports ALJ's reasoning, which was entitled to substantial deference); *see also Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."). Substantial evidence supports the ALJ's decision here, even if the opposite conclusion could have been reached.

Plaintiff then takes issue with the ALJ's use of the word "normal" when discussing Plaintiff's mental status exam findings during counseling. (ECF No. 9, PageID.1447). Plaintiff cites to records showing he presented at some therapy sessions with anxiety, moderate levels of distress or impairment, depression, and poor eye contact. (*Id.*). Although he acknowledges that he presented with "normal" findings at some sessions, he again argues the ALJ selectively chose to only discuss the good results.

This argument is also belied by the ALJ's decision, which acknowledged Plaintiff's impairments in the very same paragraph that found they would be well accounted for with the RFC restrictions imposed, instead of the severe restrictions

28

opined by Putnam. (ECF No. 6-1, PageID.1053). Claims of cherry-picking record evidence rarely succeed: "the same process can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009); *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) (crediting argument of cherry picking requires court to re-weigh record evidence). Here, "[t]o be sure, there was evidence in the record from which a reasonable person could conclude that [Plaintiff] was disabled. But the relevant inquiry is whether substantial evidence supports the ALJ's decision." *Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at *4 (6th Cir. Sept. 28, 2023).

Unlike the cases cited by Plaintiff, the ALJ here did not ignore record evidence in crafting an RFC which inaccurately described Plaintiff's abilities. *See Overman v. Kijakazi*, No. 21-cv-1008, 2022 WL 16859976, at *7 (W.D. Tenn. Sept. 29, 2022). Nor is this a case where "the ALJ's summary of the evidence does not acknowledge or address a significant amount of evidence that supports Plaintiff's mental health complaints." *Deanna B. v. Comm'r of Soc. Sec. Admin.*, No. 22-cv-00604, 2024 WL 445391, at *7 (S.D. Ohio Feb. 6, 2024), *report and recommendation adopted*, 2024 WL 1333281 (S.D. Ohio Mar. 28, 2024). Instead, the ALJ readily acknowledged Plaintiff's difficulties with interacting with others and completing complex tasks, as well as his serious need for a set routine. The ALJ merely disagreed with the severe restrictions Dr. Putnam opined were necessary due to these

limitations. That said, the ALJ still imposed restrictions in the RFC relating to Plaintiff's needs for a routine, simple tasks, and avoidance of others. Plaintiff does not challenge these restrictions nor the jobs the vocational expert opined could still be performed with these restrictions. He has therefore waived these arguments.

Finally, Plaintiff argues the ALJ did not properly evaluate Dr. Putnam's opinion using the consistency factor. As a refresher, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). An ALJ must explain his or her approach with respect to supportability and consistency when considering a medical opinion. *Id*. § 404.1520c(b). For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. § 404.1520c(c)(2). Importantly, the ALJ is "not required to articulate how [he or she] considered evidence from nonmedical sources using the requirements" above.

30

*Id.* § 404.1520c(d).

These regulations are less demanding than the former rules, but they still require the ALJ to provide a "minimum level of articulation" coherently explaining his or her reasoning. *Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 906 (E.D. Mich. 2021) (quotation omitted). The court reviews the ALJ's decision and the record as a whole, but it is not the court's job to comb through the record and imagine ways the ALJ could have applied the factors to the evidence. *Id.* at 908–09.

Plaintiff argues the ALJ merely discussed *Dr. Putnam's* notes in rejecting her opinion, which goes towards the *supportability* of her opinion, *not the consistency* of it, which requires an evaluation of *other* evidence in the record, such as records from Plaintiff's hospitalizations and mental status examinations by other providers. (ECF No. 9, PageID.1450). But, as discussed above, the ALJ did evaluate Dr. Putman's records alongside other record evidence, including from Plaintiff's prior hospitalizations and the (scant) record evidence from other medical providers. When read as a whole, the ALJ's analysis is an explanation of why both Dr. Putman's treatment notes and the other record evidence cut against Dr. Putman's opinion and ultimately against a finding of disability. In addition, the ALJ also discussed the state agency psychologist's findings, which he found more persuasive than Dr. Putnam's severe restrictions. (ECF No. 6-1, PageID.1052).

Moreover, the Court agrees with the ALJ that Dr. Putnam's records are less

persuasive due to her consistent copying and pasting of the same notes throughout treatment records for months at a time. Dr. Putnam's treatment notes are not tailored to each session. It is impossible to tell what Plaintiff's current mental state was when Putnam continually copied and pasted outdated and stale information throughout the treatment records. For example, as noted above, Dr. Putnam's records from February 3, 2023, note Plaintiff "ha[d] not been out of the house since he came to his therapy appointment two weeks ago." (ECF No. 6-1, PageID.1414). Fair enough. Two weeks later, on February 17, Dr. Putnam copied and pasted this line (in addition to the rest of the report) into the record for that appointment. (*Id.* at PageID.1411). The Court could see this still being true and therefore no need to change it. However, even in records for Plaintiff's next appointment, *two months later*, on April 14, 2023, Dr. Putman copied and pasted the entirety of the February 3 report, adding only that Plaintiff "was not seen by this therapist for a month due to therapist having a family emergency." (*Id.* at PageID.1408). The same notes from February 3 are repeated, with the addition of the family emergency line, and minimal other changes throughout November. (*Id.* at PageID.1378–1408). Dr. Putnam's notes throughout Plaintiff's yearslong treatment are riddled with similar inconsistencies, only significantly changing once a year or so. As a result, the ALJ did not find Dr. Putnam's notes very informative nor persuasive. The Court agrees. Dr. Putnam's notes did not sufficiently inform the ALJ of Plaintiff's mental status

during the relevant periods nor his progress relating to paranoia.  For the above reasons, the Court concludes that Plaintiff has not shown the ALJ erred in his analysis of the factors and the court finds that the ALJ's decision is supported by substantial evidence.

## III.    ORDER

For these reasons, Plaintiff's motion (ECF No. 9) is **DENIED**, the Commissioner's motion (ECF No. 11) is **GRANTED**, and the ALJ's decision is **AFFIRMED**.

IT IS SO ORDERED.

Date: February 26, 2026                    S/PATRICIA T. MORRIS
                                                          Patricia T. Morris
                                                          United States Magistrate Judge